CLARICE C. LIU (SBN 160555)
LIU EMPLOYMENT LAW FIRM
Four Embarcadero Center, Suite 1400
San Francisco, CA 941111
Telephone: (415) 288-8622
Facsimile: (415) 288-8633
Email: ccl@liuemploymentlaw.com

Attorneys for Plaintiff
IAN SPANDOW

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IAN SPANDOW,<br><br>            Plaintiff,<br><br>      v.<br><br>ORACLE AMERICA, INC., ORACLE CORPORATION, and DOES 1 through 100, inclusive,<br><br>            Defendants. | CASE NO. C-14-00095-SBA<br><br>**DECLARATION OF IAN SPANDOW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:     June 2, 2015<br>Time:     1:00 p.m.<br>Location: 1301 Clay Street, Oakland, CA 94612<br><br>Judge: <u>Hon. Saundra Brown Armstrong</u> |

I, Ian Spandow, declare as follows:

1. I have personal knowledge of the facts set forth herein and, if called upon to testify hereto, I could and would testify competently and truthfully thereto.

2. I am an experienced technology leader, with specialist experience and qualifications in the areas of Learning, Training and Coaching. I have led training courses in more than 20 countries including the United States, Austria, Belgium, Canada, Denmark, Dubai, France, Egypt, Germany, India, Ireland, Italy, Kenya, the Netherlands, Norway, Poland, Portugal, Romania, Russia, Saudi Arabia, South Africa, Spain, Sweden, United Arab Emirates, and the United Kingdom.

3. I joined Oracle – Europe, Middle East and Africa ("EMEA") in 2005. Immediately before my position at Oracle, I was a Managing Partner of Modena Multimedia from 2003 to 2005. In that capacity, I designed and provided sales training and consultancy for corporate/ professional organizations to customers including Microsoft, Marsh International, the Irish Tourist Board, and Xerox Corporation. Prior to that position, I was the Chief Technology officer of Flexable MultiMedia, where I managed a major staff merger and had oversight of the change management program. Also in that capacity, I managed a Technical Development Team of 30 employees.

4. Before joining Flexable MultiMedia, I spent 13 years as Managing Director of Interact Services Ireland in Dublin, Ireland. In that position, I had 50 direct reports. I managed a Sales team to $2.5 million annual turnover, growing the firm from a staff of two to sixty. I provided oversight in managing, hiring and training all staff in Dublin and New York offices and travelled on trade missions to the United States with the Irish Prime Minister.

5. In August 2005, I joined Oracle EMEA in Dublin, Ireland. After less than one year as a sales coach, I was promoted to Lead Sales Instructor for Europe Middle East and Africa. In that capacity, I trained approximately 1,000 new hires, coached hundreds of sales representatives on sales skills, provided on-the-job training and assistance on significant opportunities, and implemented new learning methods. Based on my success in that position, I was promoted in

January 2008 at Oracle EMEA as a Coaching Manager. In that vital role, I served as a Coaching Team Manager responsible for coaching, performance management, and career development of team members.

6. I managed and led coaching staff in Dublin, Paris, Potsdam, Prague and Dubai. In this position, I had significant personnel management duties. I directly managed the work activities of three internationally based direct reports holding the titles of Sales Skill Coaches. I had authority over major personnel actions including hiring, firing, performance evaluations, interviewing, and reviewing the work of the employees under my supervision.

7. My accomplishments attained at Oracle EMEA included the following:

| Year | Type | Description |
| --- | --- | --- |
| 2005 | Awarded | Tech GB (UK) "Significant Contributor Award" for coaching |
| 2006 | Awarded | "EMEA Innovation Award" for development of new sales coaching tool |
| 2006 | Certified | Obtained Certification as Lead Instructor for S.P.I.N sales methodology |
| 2007 | Promoted | Promoted to Lead Sales Instructor |
| 2007 | Certified | Obtained Certification as Lead Instructor Infomentis Sales methodology |
| 2007 | Certified | Obtained Certification as Lead Instructor Sandler Sales methodology |
| 2008 | Promoted | Won management Role and led sales coaching team |
| 2009 | Certified | Completed Master NLP qualification and certification |
| 2010 | Education | Led EMEA University Diploma Program for Oracle staff |
| 2010 | Awarded | Won "Best Mentor" Award – Middle East / Africa |

8. In my tenure at Oracle EMEA, I had successfully trained more than 2,000 Oracle staff in more than 12 countries all over Europe, Middle East and Africa. I had received highly favorable feedback from the staff in my trainings.

9. Based on my successful tenure at Oracle EMEA, I was recruited to relocate to

-3-
DECLARATION OF IAN SPANDOW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Oracle's Headquarters at Redwood Shores, California, in the United States in 2010. The company provided and sponsored an L1 visa. Specifically, Ryan Kelley initiated my transfer, and offered me the position of Sales Development Manager. The position is considered a "M3" position within Oracle. I was offered an annual base salary of $83,510. Attached as **Exhibit 1** is the description of my position and compensation provided to me by Ryan Kelley.

10. I was interested in the Sales Development Manager position because it was a continuation of my existing training and coaching career at Oracle EMEA. However, approximately three months after my arrival to the United States, Oracle changed my position to Business Development Manager. I accepted that change reluctantly although I would not have accepted that role for the relocation.

11. Nevertheless, I excelled as a Business Development Manager. In that capacity, I was responsible for all USA inbound inquires for 36 Representatives and Regional Managers. I led teams in Burlington, Massachusetts; Reston, Virginia; and Bangalore, India. Each of these teams achieved or significantly exceeded their targets. While managing these teams, I also functioned as the Lead Sales Skills Instructor & Management Coach for North America. I trained over 100 Sales Managers on leadership skills, trained more than 500 new sales representatives, trained instructors on improved and new delivery skills, designed and documented a new on-boarding program, and designed and implemented a new Sales Strategy. I had received numerous favorable feedback from the employees, including managers, that I had trained. Attached as **Exhibit 2** is a true and correct copy of some of the feedback I received from my training.

12. Based on my performance, I won the "Significant Contributor" Award for coaching reps and managers. Attached as **Exhibit 3** is a copy of a picture of the Award.

13. I also received the "Boiling Point" Award for significant contribution to management skills. Attached as **Exhibit 4** is a copy of correspondences concerning my success in that regard.

14. To my dismay, however, I was informed in or about July 2012 that my position would be eliminated due to a restructuring. However, Ryan Kelley informed me of an opening for

1  a position of Senior Regional Manager in Database Sales under Keith Trudeau.

2  15.   To obtain the new Regional Manager position, I went through a rigorous interview process, including interviewing with Scott Little (Group Vice President for National Technology West); Matt Benelli (Group Vice President of National and Emerging Technology Sales); Keith Trudeau (Sales Director of National Technology West); Leslie Ponzini (Assistant Vice President Southern California National Technology West); Chip Hover (Regional Manager of Southern California Field Technology Sales); Sean Fotoohi (Sales Consulting Manager of National West Technology); and Ralph Seferian (Vice President of Sales).  It is my understanding that they were all satisfied with my background and interview and approved of my hiring.

16.   In the new Regional Manager position, I was offered a base salary of $76,772, which was reduced from my former base salary of $95,231.  My new position was supposed to offer a higher commission portion (to give rise to the same overall target level).  However, it was substantially more difficult to earn commissions in the new position because the commissions for my former position were based on the achievement of employees across America, which was a much larger group with greater consistency in the performance.  By contrast, the commission computation for my new Regional Manager position was based on the achievement of my eight direct reports, which led to greater uncertainty and volatility.  I understand that Oracle is claiming that my overall package remained the same.  However, that statement is misleading because of the greater challenges for the criteria of obtaining commissions in the new role.  Moreover, as will be addressed below, Oracle was delinquent in paying the commissions that I was due.

17.   In the Regional Manager position, I reported to manager Keith Trudeau, along with my peers including Talin Sarkis-Kelly and Kenneth Avery who also reported to Mr. Trudeau.  Although our job titles and responsibilities were the same, I had long believed, and recently confirmed, that my salary was below that of Talin Sarkis-Kelly and Kenneth Avery.  Attached as **Exhibit 5** is a true and correct copy of the Request for Admissions that I have reviewed in which Oracle admitted that my salary was below that of Ms. Kelly and Mr. Avery.

18.   I believe that I was more experienced and better qualified for the position than both

Talin Sarkis-Kelly and Kenneth Avery, including my longer tenure at Oracle compared to either of them. I also had more years of experience in database sale, more IT experience, and more management experience than Ms. Sarkis-Kelly and Mr. Avery. I have also learned that my base salary of $76,772 was at the lowest of my salary range (which spanned from $76,772 to $122,835, with the midpoint being $99,804, and average being $80,767). I believe that I was offered a lower salary than Talin Sarkis-Kelly and Kenneth Avery because of my national origin from Ireland. I also believe that I was repeatedly denied promotions because of my national origin.

19. I understand that Oracle is making the argument that I did not have the relevant management experience, when in fact I had over 15 years of management experience. I had been a Manager in Oracle EMEA for three years with three direct reports and five indirect reports, for a total of eight employees under my management. Also, I had 13 years of experience as Managing Director of Interact Services where I had approximately 50 direct reports. Therefore, Oracle's claim of my lack of management experience is unfounded.

20. During my employment at Oracle in California, I received two performance evaluations, one in August 2011, and the second one in August 2012 – just four months before my termination. In that most recent August 2012 evaluation, I received "Successfully Meets Expectations" in five categories, "Exceeds Expectations" in four categories, and "Outstanding" in three categories. Attached as **Exhibit 6** is a copy of my 2011 and 2012 Evaluations.

21. As a Regional Sales Manager, a substantial component of my compensation was commission. However, Oracle had failed to pay my commissions, causing a delay for months. While my base salary was reduced – and I was not receiving my commissions – I experienced substantial financial hardship which affected my ability to meet my financial obligations. Due to this difficulty, I had made many inquiries to Ryan Kelley, Keith Trudeau, and Melissa Bogers of the Human Resources Department. Attached as **Exhibit 7** is a true and correct copy of some of the emails in which I requested the payment of my commissions.

22. As part of my responsibilities as a Regional Manager, I had to fill vacancies for Internet Sales Representatives II (job code 6920) in our department. On or about August 29, 2012,

1  one of the candidates Pavan Kampli submitted an application through the Oracle job application
2  system. Attached as **Exhibit 8** is a true and correct copy of Mr. Kampli's application dated
3  August 29, 2012.

4  23.  As background, I had worked with Mr. Kampli for many years prior to 2012. I
5  believed that he was very effective and committed employee. At that time, Mr. Kampli had been
6  at Oracle since 2006 in India, and had been a Business Development Manager at Oracle since
7  December 2011. I knew from working with him that he was highly committed and was very
8  successful as a manager and a coach. I found him to be both terrific professionally and had
9  exhibited great integrity. In applying for the position, Mr. Kampli also provided a summary of his
10 experience and accomplishments to me. Attached as **Exhibit 9** is a true and correct copy of Mr.
11 Kampli's email dated September 5, 2012.

12 24.  Subsequently, a teleconference call was set up on September 13, 2012 when Mr.
13 Kampli interviewed with various employees in my department, including Keith Trudeau, Kelly
14 Sarkis-Kelly and Jeff Smith. They were all impressed with him and agreed to move forward with
15 his hiring immediately. Attached as **Exhibit 10** is a true and correct copy of an email from Mr.
16 Kampli dated September 13, 2012 regarding the interviews.

17 25.  Having the approval for hiring, I wrote the justification needed for the Oracle
18 Workflow to seek approval for his salary with the assistance of my manager Keith Trudeau. Mr.
19 Trudeau provided me with feedback on the justification. Attached as **Exhibit 11** is a true and
20 correct copy of Mr. Trudeau's email dated September 18, 2012 providing me with wording for the
21 Workflow for Pavan Kampli.

22 26.  I then submitted Mr. Kampli to the Oracle Workflow on October 8, 2012. On
23 October 11, 2012, I received an email from Ryan Bambling of Oracle's Human Resources
24 requiring further information on the justification of the candidate. Attached as **Exhibit 12** is a true
25 and correct copy of Ryan Bambling's email to me requesting further information.

26 27.  Around the same time, I also worked with Keith Trudeau to hire two other Internet
27 Sales Representatives II (job code 6920) – Trevor Marshall and Matt Springle. I was authorized,

-7-
DECLARATION OF IAN SPANDOW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

and subsequently proceeded, to make an offer of $65,000 base salary to Trevor Marshall and $62,000 to Matt Springle. Both Matt Springle and Trevor Marshall were Caucasian employees who were in identical positions as the role to be filled by Mr. Kampli. Attached as **Exhibit 13** are true and correct copies of the Workflow submitted for Mr. Springle and Mr. Marshall, reflecting their respective salary.

28. Based on Mr. Kampli's experience and the salary for comparable hires, I sought approval from management for an offer to Mr. Kampli for $65,000 base salary as well. That salary would have been comparable to the salary offered to Trevor Marshall and Matt Springle – hired in the same time frame, for the same position, and for the same job code.

29. The Human Resources department, however, denied my salary request for Mr. Kampli. On October 15, 2012, Ryan Bambling of Oracle's Human Resources wrote to me, in pertinent part:

"Ian,

After speaking with CorpComp, we would recommend for you to change the offer to $50,000.00 USD base and the same for ATV."

Attached as **Exhibit 14** is a true and correct copy of a chain of emails containing Ryan Bambling's email dated October 15, 2012.

30. In response, I wrote to Ryan Bambling on October 15, 2012:

"Hi Ryan,
Thanks for the heads-up. Sadly, this looks like a no-go. I have ethical and/or legal problems with offering a 7 year Oracle veteran and a Regional Manager so much less than an brand-new/unknown American doing exactly the same job. I'm pretty sure I'd be breaking the law/discriminating against him based on his ethnicity, and ethically I simply won't do that."

Attached as **Exhibit 14** is a true and correct copy of a chain of emails containing my email to Ryan Bambling's dated October 15, 2012.

31. Concerned about the blatant pay discrepancy, I again wrote to Ryan Bambling on October 23, 2012:

-8-
DECLARATION OF IAN SPANDOW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

> "Hi Ryan, greetings from Ireland. I'm off work dealing with sick parents but wanted your thoughts on this.
>
> Pavan is a 7 year Oracle professional who has already been in my team (Jan 2010 – Jan 2011). He knows everyone on the team, and will of course, know what they earn within days of arriving. Moreover, he has 6+ years Oracle experience ahead of them.
> I can't, in good conscience, even mention $50K/$50 to him. It would be nothing short of discriminating against him based on his ethnicity/country of origin. . .
> So my question to you? How or what do I have to do / write to get a reasonable (60+) offer to him?"

Attached as **Exhibit 14** is a true and correct copy of a chain of emails containing my email to Ryan Bambling dated October 23, 2012.

    32.    To confirm that I was correct in that salary offer, I asked Vice President Ryan Kelley whether all salaries had been reduced. On October 30, 2012, Mr. Kelley replied that the salary structure had not changed. Mr. Kelley also suggested that an argument should be made to Corporate Compensation that its approach did not make sense because Pavan Kampli was at that time a manager taking a lower position as an Internet Sales Representative, and he should not go to the same compensation point in the scale. Attached as **Exhibit 15** is a true and correct of my email correspondence with Ryan Kelly.

    33.    Subsequently, Mr. Bambling apparently forwarded my email to his Manager, Melissa Bogers at Oracle's Human Resource Department. Ms. Bogers responded in an email dated November 7, 2012 what I believe to be a chastising tone. As she stated in her email to me:

> "Ian, We will review the transaction once it is resubmitted and provide a recommendation based on the facts provided including but not limited to what I previously stated below. If you have questions, please contact me to discuss. As a reminder, if you have questions regarding the recommendations provided by anyone in the approval chain, you may contact them directly.
>
> **Your assertions below regarding discrimination should not be made, and are not taken, lightly.** I need to set up time with you to discuss any facts you may have regarding that statement. Please let me know when you have availability."

Attached as **Exhibit 14** is a true and correct copy of a chain of emails containing Melissa Bogers's November 7, 2012 email to me. (emphasis added.)

    34.    On the same date, November 7, 2012, when I brought up this matter with my

-9-
DECLARATION OF IAN SPANDOW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

manager Keith Trudeau regarding the approximately thirty percent (30%) pay differential, he wrote to me "Please let sleeping dog lie on this one." Attached as **Exhibit 16** is a true and correct copy of Keith Trudeau's email dated November 7, 2012.

35. I raised my concern verbally with my manager Keith Trudeau several times, and Mr. Trudeau encouraged me to proceed with the lower amount for Mr. Kampli because he said that "would be good money for an Indian."

36. Subsequently, I met with Melissa Bogers of Oracle's Human Resources Department. In that discussion, Ms. Bogers was insistent of the company position that it was fair to offer Mr. Kampli a lower salary than the other Caucasian employees who were just hired within the past months at a higher salary for the same position. In what appeared to be a disingenuous statement, Ms. Bogers said that I was free to resubmit Mr. Kampli again at a higher salary level. However, I did not understand how that could lead to a different outcome when Corporation Compensation and Human Resources were approving only a base salary of $50,000 for Mr. Kampli.

37. Nonetheless, on November 21, 2012, I re-submitted another request for Mr. Kampli again, this time asking for $60,000 base salary for him. Although this salary level would still be below that of Matt Springle and Trevor Marshall, I was hoping that Pavan Kampli could obtain more than the $50,000 base salary approved by Oracle's Corporate Compensation and Human Resources. Attached as **Exhibit 17** is a true and correct copy of the email confirming my submission for Pavan Kampli into Oracle's Workflow.

38. By November 29, 2012, I still had not heard back from Corporate Compensation after my November 21, 2012 submission. Because our department was needing to fill the vacancy, I wrote an email to Melissa Bogers, asking for her assistance. In my email to her on November 29, 2012:

> "Hi Melissa
> Matt and Rudi are really pressing me to complete headcount. Pavan has been with corporate camp for a while now, can you shed any light? Thanks in advance."

Melissa Bogers then responded:

-10-
DECLARATION OF IAN SPANDOW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

> From: Melissa Bogers
> Sent: Thursday, November 29, 2012 11:24 AM
> To: Ian Spandow
> Cc: Keith Trudeau
> Subject: RE: Pavan Kampli
>
> Hi Ian,
> Thanks for letting me know. I will try to connect with them later corpcomp_us@oracle.com.
> Melissa"

Attached as **Exhibit 18** is a true and correct copy of the email correspondence between Melissa Bogers and me on November 29, 2012.

39. Unbeknownst to me, I was terminated just six days later, while Pavan Kampli was still in the Workflow. Later, I also learned that Oracle rejected Mr. Kampli's hiring after I was fired.

40. Oracle makes the claim that I was terminated for two purported emails between Sue Downer and myself. I believe that claim is disingenuous. As background, Ms. Downer and I had a warm and congenial professional relationship. For example, while designing the new hire program in the summer of 2011, we worked closely for many weeks on assignment in Boston, Massachusetts. We often stayed at the same hotel and shared dinner together on most nights. Ms. Downer drove me to Oracle office most mornings, and I traveled twice to Reston, Virginia, to meet with her. Again, we would typically have lunch or dinner together. When Ms. Downer visited Oracle in Redwood Shores, I would always meet with her. I also travelled to Minneapolis, Austin, and Burlington frequently on Ms. Downer's behalf. In many of the conversations, we also discussed our family as well as confided in each other in work matters. For example, she sought my advice about her son's football career and her son's relationship. I considered her to be a friend and a confidant. Ms. Downer was very complimentary to me personally regarding my work.

41. In light of our close professional relationship, Ms. Downer and I would speak very candidly with each other relating to work issues. Ms. Downer and I used to have many interesting debates over lunch and dinner. I had a nickname for her, and she had a nickname for me. I fondly

called her "the Queen of Assumptions" and she called me the "Ideas Guy." One issue that we discussed at length was the quality of the John Costigan training provided to Oracle employees. I expressed my view that there could be issues of copyright infringement when John Costigan's materials appeared to have copied the Sandler training materials provided to Oracle. I was also informed that Sandler had serious concerns with respect to John Costigan's use of the materials.

42. In fact, Matt Benelli (Group Vice President of National and Emerging Technology West) made clear that his group would not participate in the John Costigan training. I attended the deposition of Sue Downer, and she admitted in her deposition that Matt Benelli had made that policy that employees in his group would not attend the Costingan training. Hence, the September 13, 2012 email that I sent to Ms. Downer was an accurate depiction that her training group should not invite or nominate employees in my group to attend that training. Attached as **Exhibit 19** is a true and correct copy of my email dated September 13, 2012 to Ms. Downer.

43. It was also in that context of many years of friendship and trust, that I brought to Ms. Downer's attention my concerns about the training in November 2012. I believe that my email contained some elements of venting because, at that juncture, I had been owed commissions by Oracle for months, my base salary was substantially reduced, and I was asked to participate in a role-play for a training in which I contributed as a designer. Attached as **Exhibit 20** is a true and correct copy of my email dated September 27, 2012 to Ms. Downer.

44. It is also important to note that, to my face, Ms. Downer never complained about my tone at any time. In fact, her email correspondences to me were largely very favorable. Ms. Downer also invited me to apply for a trainer position in her department. Attached as **Exhibit 21** are true and correct copies of the email correspondence between Ms. Downer and myself that I believed reflected our excellent relationship in which she was highly complimentary. Therefore, I was very surprised that I was fired allegedly because of two of my emails to her.

45. Oracle also made reference to my relationship with Megan Black. Ms. Black and I lived together for approximately nine months. However, when we ended our relationship, I learned that she took a significant amount of funds from my bank account. When I attempted to

-12-
DECLARATION OF IAN SPANDOW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ask her to repay the amount, she sought a restraining order against me, as she did against other of her former partners. Unfortunately, I believe due to my lack of attorney representation at the hearing, a TRO was issued. However, it allowed for "inadvertent contact" at work. Subsequently, even Keith Trudeau had lodged complaints against Ms. Black for her inappropriate conduct with myself and my team. Attached as **Exhibit 22** are true and correct copies of Mr. Trudeau's complaints against Megan Black for her inappropriate conduct in approaching myself and my team at Oracle.

46. On November 29, 2012, I was asked to meet with Matt Benelli and Keith Trudeau. It was a very short meeting for a matter of minutes. Mr. Benelli asked me whether I wrote the email to Sue Downer and said that it should have been better handled. I told him that I felt that my email was truthful, and he said that he did not need me to apologize if I did not feel I did anything I need to apologize for.

47. After the meeting, I wrote an email to Mr. Benelli in which I followed up on our meeting. In that email, I provided information to Mr. Benelli regarding my situation at that time with my very ill parents in Ireland and also brought to his attention the many positive comments that I had received during my employment at Oracle. I also reiterated that I was working to build the most successful and accomplished sales team at Oracle. Attached as **Exhibit 23** is a true and correct copy of my email to Matt Benelli on November 29, 2012.

48. On December 5, 2012, I was summoned to meet with Jeff Perry and Keith Trudeau. I was fired at that meeting. I was not given any reason. After the meeting, Jeff Perry supervised me to gather my belongings in about 20 minutes and then escorted me to leave the building.

49. Up to this time, no one at Orcale, including Mr. Benelli had told me that I could be terminated for writing any communication or for any reason. I was never given any Notice of Counseling, any written warning, any Performance Improvement Plan. In fact, as a manager, I was trained that the standard Oracle personnel procedure required the issuance of one verbal warning, two written warnings, and then moving to a Performance Improvement Plan ("PIP"), before the ultimate step of termination. It is especially stunning in this instance when I had been a

an alleged email and without any prior disciplinary actions.

50.  I believe that I was terminated because I asked for a comparable salary for Pavan Kampli, an employee in India, and for opposing Oracle's discriminatory pay practices. I believe that Oracle especially rushed to terminate me quickly – in a matter of days – because Oracle attempted to silence me and prevent me from making further complaints of discrimination while Mr. Kampli was still in the Workflow pending approval. Subsequently, Oracle also rejected Mr. Kampli's hiring after Oracle terminated my employment.

Executed this 11th day of May, 2015 at San Francisco, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____
IAN SPANDOW