UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IAN SPANDOW,<br><br>       Plaintiff,<br><br>vs.<br><br>ORACLE AMERICA, INC., ORACLE CORPORATION, and DOES 1 through 100, inclusive,<br><br>       Defendants. | Case No:  C 14-0095 SBA<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |

    Plaintiff Ian Spandow ("Spandow") brings the instant wrongful termination action against Defendants Oracle America, Inc. and Oracle Corporation (collectively, "Oracle") alleging two claims for relief under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq.  The parties are presently before the Court on Oracle's motion for summary judgment.  Spandow opposes the motion.  Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS Oracle's motion, for the reasons stated below.  The Court, in its discretion, finds this matter suitable for resolution without oral argument.  See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

**I.    BACKGROUND**

    **A.    Factual Background**

        **1.    Spandow's Conflict with Oracle's Training Team**

    Spandow, an Irish national, began working for Oracle in Europe in 2005.  His primary responsibilities were to train and coach sales employees.  In 2011, Spandow transferred to an Oracle division in the United States.  Following his transfer, Spandow assumed the role of Business Development Manager, which was neither a direct sales nor a

training position.  Upon his request, however, Spandow was permitted to continue providing sales trainings in collaboration with a local training team led by Oracle Senior Director Sue Downer ("Downer").  Downer's team was responsible for developing and presenting sales training programs to "Oracle Direct" sales representatives.

Spandow began working with Downer's team in September 2011.  Spandow's training presentations were well received; however, his relationship with Downer and her team members grew contentious.  According to Downer, Spandow was extremely opinionated, and began to criticize and undermine the Oracle Direct sales training program.  Among other things, Spandow frequently and publicly criticized one of Oracle's outside training vendors, Costigan Training.  Additionally, Spandow insulted Downer and other employees, and made derogatory remarks about the religious beliefs of one team member and the physical appearance of another.  In early 2012, Downer expressed her dissatisfaction with Spandow to her supervisor Rudy Corsi, Spandow's director manger Ryan Kelley ("Kelley"), and Human Resources Director Melissa Bogers ("Bogers").

Downer found Spandow to be increasingly disrespectful and argumentative.  In or around April or May 2012, Downer observed Spandow using a media clip in his training presentations that she considered inappropriate in the workplace; a portion of the clip contained offensive language and content.  Downer instructed Spandow to cease using the objectionable portion of the clip.  During a subsequent sales training presentation, Spandow publicly accused Downer of treating Oracle employees "like children" by prohibiting him from using the full clip.  Downer regarded this incident as the "last straw," and decided to exclude Spandow from future sales trainings.  At that time, Spandow's fulltime duties reverted to managing the Business Development team.

In June 2012, a restructuring occurred at Oracle, resulting in the elimination of Spandow's position.  Spandow's separation was set for mid-July 2012.  Before his separation, however, Spandow obtained a transfer to an open Regional Sales Manager position in the Oracle Direct sales organization.  The transfer went into effect on August 1, 2012.  In his new role, Spandow reported to Sales Director Keith Trudeau ("Trudeau"),

who, in turn, reported to Oracle Direct Vice President Matt Benelli ("Benelli").  As a sales manager, Spandow was again required to interact with Downer and other members of her team, as they would be training the sales representatives supervised by Spandow.  Upon learning of Spandow's transfer, Downer contacted Benelli and stated she would have "zero tolerance" for any inappropriate conduct.

Around the time of the transfer, Kelley completed Spandow's performance review for fiscal year 2012.  Kelley gave Spandow a "2-Development Needed" rating in the area of "Core. Professional. Building Relationships."  Kelley noted: "[W]hile Ian has many strong relationships with management, [he] also has more than usual contentious ones.  For FY13, key is to find more ways to interact/influence in a way that result[s] in positive/neutral working relationships."  From Kelley's perspective, conflicts arose out of Spandow's unprofessional comments and tone and his often "undue and caustic criticism" of Downer, her team, and Costigan.  Although Spandow requested a revised rating, Kelley refused.

On or about September 13, 2012, Spandow wrote Downer an email stating that, although representatives on his team had been "nominated" to attend a Costigan training, he "insisted" they not attend.  The email further requested that Downer not invite or nominate any of Spandow's representatives to attend future Costigan trainings because the trainings were not "professional" or "original in any way."  Spandow stated that, as a professionally licensed and certified trainer, he was "perplexed and confused as to why Oracle [would] pay so dearly for such amateur and corny sales training."  Downer and Benelli considered the email inappropriate in tone and content.  In response to an email from Benelli, which asked whether Spandow could have handled the matter better, Spandow replied:  "[Y]es.  Fair comment, I'm not famous for mincing my words. . . . Noted and will tone it down."  Benelli later spoke with Spandow in person, stated that the email was inappropriate, and cautioned Spandow to communicate in a more professional manner in the future.

On November 21, 2012, Downer's training team asked Oracle Direct managers, including Spandow, to participate in a "role play" training session for newly hired sales representatives.  The training team further requested that any manager unable to participate

at the allotted times find a replacement. On November 26, 2012, after receiving a reminder about the upcoming session, Spandow replied: "I won't be participating in the mock calls, so can't help here I'm afraid." When asked to find a replacement, Spandow responded, copying Downer: "[M]y availability to participate in the role-plays for New Hires has nothing to do with my availability, and I won't be finding a replacement for myself, the training team will have to work that out. I'm honestly shocked that I was put on the list."

On November 27, 2012, Downer replied, stating that Spandow, like all of the regional managers, was required to participate in the training sessions. Spandow responded as follows, copying his former manager, Kelley:

> I feel personally insulted, offended and back-stabbed by the way my contribution to the training team was handled, and by the complete lack of any communication from my colleagues since I completed the documentation of new-hire in May. . . . Despite being a training and learning professional for 20+ years, my suggestions re Unit/Topic/Module conventions were completely ignored. This is basic 101 learning protocol. It appears we are not playing to our strengths.
>
> I understand that you were forced to reduce the training team this year. However, I noticed Eric Stoddard got a promotion this summer, presumably for his work on the associate program, I on the other hand, got laid-off. Seems somewhat un-even wouldn't you agree? I was forced to take a pay-cut, and return to sales management after 10+ years out of it. I report now to one of my coach-the-coach trainees, someone I coached from M2 to Director (M4) in 12 months.
>
> I'm well aware that recent changes meant cut-backs for all. However, it doesn't take much to say "thank you" or perhaps write a note. I have heard nothing from anyone (except Michelle) on the training team since May. However, on a weekly basis I'm asked for assistance, or quizzed about training in general by RWS staff. As you know, we don't have a training presence assigned to HQ, so the default belief is that I'm the go-to person. I brought this to your attention some time ago, nothing has changed, hundreds of reps still assume I'm the trainer because I trained them last year.
>
> I have 6 + years experience training Oracle new hires, yet no-one on your team thought to arrange a formal hand-over of assets and/or knowledge. The corner of my office is still filled with Sandler manuals, disks and assets, which I distribute as needed.
>
> Lastly, and embarrassingly, I'm asked why Oracle would fly a trainer to RWS when I'm based right here? Zach appeared very uncomfortable when he arrived to deliver the last course, given that no-one in the training team thought to mention it to me. I assume Bill will continue to avoid me as he has done for 6 months, so any synergy between the training team and what RWS staff believe to be their local training resource, will be exposed as non-existent.

> Thus, as a professional, and mindful that Oracle looks good to new hires, I will not participate in the role-plays because it raises too many questions re my involvement and remit. My personal brand has been severely damaged by this, and my career in learning and coaching abruptly halted.
>
> Please feel free to forward this mail to Rudi, I'm sure he will understand, and I'll will be more-than-happy to expand on my experience. As I mentioned, given my treatment by the training team, I'm stunned that you would include me on this.

Kelley forwarded the email to Benelli, who discussed it with Downer. Both Downer and Benelli regarded the email as inappropriate and insubordinate.

On November 29, 2012, Benelli and Trudeau met with Spandow. Benelli wanted Spandow to apologize, agree to participate in the training, and make amends with Downer. Spandow was unrepentant, however, stating that he "stood by every word" of his email, would not participate in the training, and would not apologize. Spandow made further derogatory remarks about Downer and discriminatory remarks about another training team member, Eric Stoddard. In the course of the meeting, Benelli determined that it was not possible for Spandow to work cooperatively with the training team, even though that was an essential function of his job. Benelli also found that Spandow's conduct was entirely unacceptable for an Oracle sales manager. Benelli decided to terminate Spandow.

## 2. THE PROPOSED TRANSFER OF PAVAN KAMPLI

In the meantime, when Spandow assumed the Regional Sales Manager position in August 2012, two or three Internet Sales Representative positions were open. Spandow identified Pavan Kampli ("Kampli") as a candidate for one of the open positions. Kampli was then working as a Business Development Supervisor in India, but had previously worked as an Oracle Direct Sales Representative. Spandow had worked with Kampli in the past, and assured Trudeau that Kampli would made a great addition to the team. Around the same time, Spandow assisted in efforts to hire two other individuals from outside the company-- Trevor Marshall ("Marshall") and Matt Springle ("Springle")--to fill the other open positions. Marshall and Springle are Caucasian. Kampli is of Indian decent.

Oracle's internal hiring process requires the initiation of an online application, referred to as a "workflow." A hiring manager is required to provide a proposed salary, as

well as information regarding the employee's qualifications, current position, compensation history, and performance. Human Resources and Corporate Compensation then review the workflow, before the relevant managers and CEO office approve it. Neither Human Resources nor Corporate Compensation has the power to reject a proposed salary; their role is simply to make recommendations and provide guidance. According to Trudeau, it was his practice to propose a base salary of $65,000 for Internet Sales Representative positions. However, the salary ultimately approved for a given sales representative might differ from the amount he proposed based on a variety of factors including, but not limited to, the individual's current compensation, his or her relative work experience, and his or her prior performance in a sales role.[1]

On or around October 8, 2012, Spandow submitted a workflow for Kampli's transfer. He recommended a proposed base salary of $65,000.[2] Human Resource representative Ryan Bambling ("Bambling") sent the proposed salary to Oracle's Corporate Compensation Department, where compensation analyst Tatyana Rozenblum ("Rozenblum") reviewed it. On October 12, 2012, Rozenblum recommended a base salary of $50,000 based on a variety of factors, including Kampli's compensation history and prior sales performance, which Rozenblum characterized as "mediocre."[3]

On October 15, 2012, Bambling conveyed Corporate Compensation's salary recommendation to Spandow. Spandow responded: "Thanks for the heads-up. Sadly, this looks like a no go. I have ethical and/or legal problems with offering a 7 year Oracle

---

[1] The workflows initially submitted for Marshall and Springle proposed base salaries of $65,000 per year. Corporate Compensation recommended a base salary of $65,000 for Marshall and a base salary of $62,000 for Springle. Marshall and Springle both had significant "quota carrying" technology sales experience. Additionally, Marshall's hire was deemed "competitive," meaning that he was being hired away from another company.

[2] Like all sales representative, Kampli would also earn commissions based on his attainment of sales quotas. If Kampli attained 100% of his quota, his commissions would be equal to his base salary, i.e., $65,000, for "on target earnings" of $130,000.

[3] Rozenblum noted in an email: "If [Kampli] were to come to the US laterally, that would translate to 45,570 in base salary. Based on his background and attainment (attained 49% in internet sales rep roles), Corp Comp recommend a base salary of $50,000."

veteran and a Regional Manager so much less than an [*sic*] brand-new/unknown American doing exactly the same job. I'm pretty sure I'd be breaking the law/discriminating against him based on his ethnicity, and I simply won't do that." In response, Brambling stated: "I can assure you that this offer I had mentioned is in complete compliance with all of Oracle's policies. There are conversion tables that take into account his current Oracle salary. If you would like to move further please call me to discuss."

On October 23, 2012, Spandow replied:

> I can't in good conscience, even mention $50K/$50 to him. It would be nothing short of discriminating against him based on his ethnicity/country of origin. In Europe, it's [*sic*] illegal to pay someone less than another for exactly the same job, in particular, if they are a minority. [Kampli] has more experience than his proposed team-mates, and he's an M2 right now, and is taking a demotion to work for me as a rep, with nothing more th[a]n a verbal promise from me that . . . I'll help him get back into management as soon as possible. I'd be insulting him to offer the very bottom of the pay range, and as I mentioned, I have ethical problems doing so anyway.
>
> So my question to you? How or what do I have to do/write to get a reasonable ($60+) offer to him.

Brambling forwarded the email exchange with Spandow to Bogers. On October 25, 2012, Bogers sent Spandow an email stating:

> We consulted with Corporate Compensation regarding this international transfer. Based on the facts provided including but not limited to current comp ratio, experience, fiscal year performance and moving from management to an individual contributor role, Corporate Compensation and Line HR determined a proposed salary that was different than what you proposed. If you wish to submit this international transfer and propose a salary of $60K or higher, you are able to do so. It will be reviewed by line HR, your management chain, corporate compensation and the CEO's office. If you have questions regarding the recommendation provided by anyone in the approval chain, you may contact them directly. Also, let me assure you that decisions with respect to salary are not based on factors such as ethnicity. If you have facts to support your below assertions otherwise please let me know and we can look into them.
>
> Please note that [Kampli] is a M1 not a M2.
>
> When you return to work, please contact me regarding this situation. I want to discuss it in more detail. Also, I want to know if you have or will be discussing this with your management chain to ensure they support the salary that you are proposing.[4]

---

[4] On October 15, 2012, Spandow had traveled to Ireland due to the illness of his father. He returned to the United States and to work on or about November 6, 2012.

At the time Spandow was attempting to hire Kampli, both Benelli and Trudeau were concerned about unfilled sales representative positions and the impact of such openings on the team's ability to meet sales quotas. On October 22, 2012, Spandow sent Trudeau an email update regarding Kampli's potential transfer. Spandow stated that the transfer was a "no-go" because "HR won't approve more than 50K base and 50K com [i.e., commission], and I'm not going to practice racial discrimination in the team." Trudeau replied: "[Kampli] isn't proven in sales at Oracle. He only made his # one quarter when he was in EMO. 65K is top of the range. 50 is low, but not unreasonable for someone who didn't kill it in the few quarters he held a bag here. . . ."[5] On or about November 4, 2012, Benelli also became generally aware of the issues in completing Kampli's transfer application. On November 5, 2012, Benelli asked Trudeau to assist in "putting [the matter] to rest." A few days later, Trudeau encouraged Spandow to "Go for it @ the 60/60 you mentioned."[6]

On November 6, 2012, Spandow responded to Bogers' email: "Hi Melissa, thanks for your response, noted that [Kampli] is actually an M1, my mistake. Finally getting on top of emails again and wanted to re-submit this. I'm going to send it through @ 60/60 and see how we get on." On November 7, 2012, Bogers replied, reiterating that Spandow was free to submit whatever proposal he deemed fit. Bogers also stated: "Your assertions . . . regarding discrimination should not be made, and are not taken lightly. I need to set up a time with you to discuss any facts you may have regarding that statement."

On November 13, 2012, Bogers spoke with Spandow by telephone to discuss his claims of discrimination. According to Bogers' contemporaneous notes, Spandow stated that he did not have any facts to support the notion that Corporate Compensation's salary recommendation was discriminatory based on Kampli's Indian descent. Instead, Spandow stated that he had an "ethical issue" with the proposed salary. Bogers explained that the

---

[5] Oracle's base salary range for an Internet Sales Representative 2 position was $42,938 to $75,142, with a median base salary of $59,040.

[6] According to Spandow, Trudeau encouraged him to proceed with a lower salary for Kampli because it "would be good money for an Indian." Kampli denies having ever made such a statement.

recommended salary was not a rejection of Spandow's proposed salary and that he could propose whatever salary he wanted. She further explained that his proposal would have to go through the workflow approval process and, if approved by all levels of upper management, the transfer and proposed salary would become effective. On November 21, 2012, Spandow submitted Kampli's workflow with a proposed base salary of $60,000.

### 3. SPANDOW'S TERMINATION

Benelli submitted an involuntary termination recommendation form for approval on November 30, 2012. The written justification for termination was as follows:

> Ian joined my organization in August 2012 - this fiscal year. Over the past few months there have been several examples that raised serious questions about Ian Spandow's ability to effectively lead a team of sales professionals.
>
> The first issue arose on September 13, 2012 when Ian Spandow sent an email to Sue Downer that was deemed by me to be both unprofessional and outside the scope of his current role. After receiving a complaint from Sue Downer, I spoke to Ian Spandow to convey my displeasure. I told him those actions were unacceptable and unprofessional. Ian agreed the communication was unprofessional and vowed to be more cautious in the future.
>
> On November 27, 2012, Ian sent another unprofessional and emotionally charged email to Sue Downer and Ryan Kelley. After reading the email it was obvious that this was, again, unacceptable behavior from a sales leader at Oracle. In the email, Ian viscerally refused to participate in training related to the new hire onboarding process that is required of all sales managers in Oracle Direct. Not only did he refuse to participate, he also refused to find a suitable replacement; thus, sending clear signals he was not interested in being a team player. Moreover, this email was laced with unprofessional comments about employees in the Training organization - one in which Ian recently worked.
>
> After receiving this email, Keith Trudeau (Ian's direct manager) and I met with Ian (November 29, 2012) to understand what prompted this email as well as to communicate that it was unacceptable and concerning behavior from a sales leader. Ian defended his actions vehemently. He said he stood by every sentence. He also expressed derogatory remarks about Sue Downer and other employees in her organization. There was no remorse. I communicated to Ian that his lack of professionalism, his manner of communication and his lack of organizational awareness were very concerning to me.
>
> Based on my conversation with Ian, I'm very concerned about his ability to do his job as a sales leader in this company. His actions have been very harmful to our organization and to the brand of Oracle; thus, I am recommending termination of employment.

Oracle terminated Spandow on December 5, 2012.

### B. PROCEDURAL HISTORY

On January 7, 2014, Spandow commenced the instant action alleging two claims for relief under Title VII: (1) unlawful discrimination based on retaliation; and (2) unlawful discrimination based on national origin. According to Spandow, Oracle retaliated against him for his refusal to participate in the company's discriminatory employment practice of paying Indian employees a salary substantially below those of similarly situated Caucasian employees. In addition, Spandow asserts that Oracle unlawfully discriminated against him based on his national origin (i.e., Ireland) by treating him less favorably than similarly situated employees who are not in the protected class.

Oracle now moves for summary judgment. In its motion, Oracle contends Spandow cannot raise a triable issue of fact regarding his claims of retaliation and discrimination. Regarding the retaliation claim, Oracle argues that Spandow did not engage in protected activity and, even if he did, he cannot produce any evidence demonstrating a causal link between his termination and the alleged protected activity. Regarding the discrimination claim, Oracle argues that Spandow has not presented any evidence that animus against Irish nationals motived his termination. Moreover, even if Spandow established a prima facie case of retaliation or discrimination, Oracle argues that Spandow has failed to show Oracle's legitimate, non-retaliatory, and non-discriminatory reasons for the termination were pretextual. Spandow opposes the motion. As a threshold matter, Spandow argues that the Court should deny Oracle's motion as untimely. Spandow further argues that he has raised triable issues of fact.[7]

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a party may move for summary judgment on some or all of the claims or defenses presented in an action. Fed. R. Civ. P. 56(a)(1). "The court shall grant summary judgment if the movant shows that there is no

---

[7] In conjunction with his opposition to the motion for summary judgment, Spandow filed a Motion for Administrative Relief to File Under Seal. Given that Oracle does not oppose the motion, and pursuant to the Stipulated Protective Order entered by this Court on June 12, 2014, Spandow's motion to file various exhibits under seal is hereby GRANTED.

1  genuine dispute as to any material fact and the movant is entitled to judgment as a matter of
2  law." Id.; see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving
3  party has the burden of establishing the absence of a genuine dispute of material fact.
4  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A) (requiring
5  citation to "particular parts of materials in the record"). If the moving party meets this
6  initial burden, the burden then shifts to the non-moving party to present specific facts
7  showing that there is a genuine issue for trial. See Celotex, 477 U.S. at 324; Matsushita
8  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).
9       "On a motion for summary judgment, 'facts must be viewed in the light most
10 favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts.'"
11 Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting in part Scott v. Harris, 550 U.S. 372,
12 380 (2007)). "Only disputes over facts that might affect the outcome of the suit under the
13 governing law will properly preclude the entry of summary judgment. Factual disputes that
14 are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248. A factual
15 dispute is genuine if it "properly can be resolved in favor of either party." Id. at 250.
16 Accordingly, a genuine issue for trial exists if the non-movant presents evidence from
17 which a reasonable jury, viewing the evidence in the light most favorable to that party,
18 could resolve the material issue in his or her favor. Id. "If the evidence is merely
19 colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-
20 50 (internal citations omitted). Only admissible evidence may be considered in ruling on a
21 motion for summary judgment. Orr v. Bank of Am., 285 F.3d 764, 773 (9th Cir. 2002).

**III. DISCUSSION**

     **A. TIMELINESS OF THE MOTION AND SUPPORTING DOCUMENTS**

24      Spandow contends the Court should strike and/or deny Oracle's motion for summary
25 judgment because it was untimely. Alternatively, Spandow contends the Court should
26 strike the declarations filed in support of the motion on the same ground.
27      "Except as otherwise ordered or permitted by the assigned Judge or [the] Local
28 Rules, . . . all motions must be filed, served and noticed in writing on the motion calendar

of the assigned Judge for hearing not less than 35 days after filing of the motion." N.D. Cal. Civ. L.R. 7-2(a). "Electronic transmission of a document in compliance with court procedures shall, upon receipt by the Clerk of the entire document and the sending of a Notice of Electronic Filing ('NEF') by the ECF system, constitute filing of the document for all purposes and shall constitute entry of that document on the docket maintained by the Clerk pursuant to Fed. R. Civ. P. 58 and 79 . . . ." N.D. Cal. Civ. L.R. 5-1(e)(3). "All electronic filings of documents must be completed as described in Civil L.R. 5-1(e)(3) prior to midnight in order to be considered timely filed that day." Id. 5-1(e)(4). "Failure by counsel or a party to comply with any duly promulgated local rule . . . may be a ground for imposition of any authorized sanction." Id. 1-4.

A review of the record reveals that Oracle filed its motion for summary judgment at 11:56 p.m. on April 28, 2015. Liu Decl., Exh. 1, Dkt. 40-1. Because the motion was noticed for hearing on June 2, 2015, Oracle timely filed the motion. Oracle filed and served the motion not less than 35 days before the hearing date. Accordingly, Spandow's request to strike and/or deny Oracle's motion for summary judgment is DENIED. A further review of the record reveals that Oracle filed six declarations in support of its motion for summary judgment between 12:00 a.m. and 12:15 a.m. on April 29, 2015. Id. While Oracle technically filed these declarations less than 35 days before the hearing date, Spandow's request to strike the declarations is not well taken. Spandow has not argued, let alone shown, that the timing of the filings has prejudiced him. Indeed, it is difficult to conceive of a manner in which this fifteen-minute delay would have caused Spandow to suffer prejudice. Accordingly, Spandow's request to strike the declarations filed in support of Oracle's motion for summary judgment is DENIED. Counsel is nonetheless advised to carefully review and follow the Local Rules; in the future, the Court may strike filings that fail to comply with the Local Rules or impose other appropriate sanctions.

### B.   TITLE VII RETALIATION CLAIM

Spandow alleges Oracle terminated his employment in retaliation for his complaints that Oracle's salary recommendation for Kampli was lower because of Kampli's ethnicity.

Case 4:14-cv-00095-SBA   Document 53   Filed 08/19/15   Page 13 of 18

Title VII prohibits retaliation against any person who has exercised his rights under the Act by claiming discrimination or seeking to enforce the Act's provisions. 42 U.S.C. § 2000e-3(a). A prima facie case of retaliation may be shown by direct or circumstantial evidence. Stegall v. Citadel Broad. Co., 350 F.3d 1061, 1066 (9th Cir. 2003). Where, as here, a plaintiff relies on circumstantial evidence, he must show that: (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. Id. If a plaintiff establishes a prima facie case of retaliation, "the burden shifts to the defendant to set forth a legitimate, non-retaliatory reason for its actions; at that point, the plaintiff must produce evidence to show that the stated reasons were a pretext for retaliation." Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1108 (9th Cir. 2008). Ultimately, "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." Univ. of Tex. S.W. Med. Ctr. v. Nassar, ___ U.S. ___, 133 S. Ct. 2517, 2534 (2013).

As an initial matter, Oracle contends Spandow has not made a prima facie case of retaliation because Spandow was not engaged in protected activity. Specifically, Oracle argues Spandow's complaints regarding discriminatory compensation did not constitute protected activity because Corporate Compensation's salary recommendations were non-binding. The Court finds this argument unpersuasive. That the salary recommendations were non-binding is insufficient to establish conclusively that Oracle's compensation practices were not discriminatory. Based on the evidence presented, it appears Corporate Compensation's recommendations had the potential to influence final approval of a salary. Regardless, the question for purposes of a retaliation claim is not whether Oracle's compensation practices were in fact unlawful, but whether Spandow had a "reasonable belief" that they were. See 42 U.S.C. § 2000e-3(a) (it is unlawful to discriminate against an employee for opposing any practice made unlawful under Title VII ); Trent v. Valley Elec. Ass'n, Inc., 41 F.3d 524, 526 (9th Cir. 1994) (a plaintiff need not prove "that the employment practice at issue was in fact unlawful under Title VII," but only that he "had a

- 13 -

'reasonable belief' that the employment practice [he] protested was prohibited under Title VII"). Accordingly, the Court is unpersuaded that summary judgment is warranted on the ground that Spandow was not engaged in protected activity.

The above notwithstanding, the Court finds no genuine issue of material fact regarding the legitimacy of Oracle's non-retaliatory reasons for terminating Spandow. Oracle's justification for terminating Spandow is clearly set forth in Benelli's email dated November 30, 2012. As a basis for termination, the email cites Spandow's refusal to participate in the role-play training or to find a suitable replacement, his unprofessional email dated September 13, 2012, his unprofessional and insubordinate email dated November 27, 2012, his lack of remorse for the November 27, 2012 email, and his derogatory remarks regarding Downer and other employees. The Court finds Oracle has submitted evidence showing that it terminated Spandow for legitimate, non-retaliatory reasons. See Stegall, 350 F.3d at 1075 (an employee's failure to maintain working relationships constituted a legitimate, non-discriminatory reason for termination); Cuevas v. SkyWest Airlines, 17 F.Supp.3d 956, 967 (N.D. Cal. 2014) (an employee's insubordination constituted a legitimate, non-discriminatory reason for termination). The burden thus shifts to Spandow to demonstrate that Oracle's proffered justification was pretextual. Spandow fails to produce sufficient evidence to raise a triable issue of fact regarding pretext.

A plaintiff may demonstrate pretext by showing that the employer's proffered explanation is unworthy of credence because it is "internally inconsistent or otherwise not believable." Chuang v. Univ. of California Davis, Bd. of Trustees, 225 F.3d 1115, 1127 (9th Cir. 2000). Where, as here, evidence of pretext is circumstantial, the plaintiff must produce specific and substantial facts to create a triable issue of pretext. Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1113 (9th Cir. 2011). The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . and hence infer that the

employer did not act for the . . . non-discriminatory reasons." Dep't of Fair Empl't and Hous. v. Lucent Techns., 642 F.3d 728, 746 (9th Cir. 2011) (citation omitted).

In opposition to the instant motion, Spandow contends Oracle's proffered justification for his termination lacks credence for four reasons. Spandow's showing is insufficient to survive summary judgment.

First, Spandow asserts Oracle failed to follow its own internal policies and procedures in effectuating the termination because Oracle failed to issue Spandow a Performance Improvement Plan, and because Benelli failed to file the termination approval form at least 14 days prior to Spandow's termination. The undisputed evidence shows that Spandow was an at-will employee, and that remedial measures such as issuing a Performance Improvement Plan were not required. Indeed, Oracle's internal guidelines regarding such remedial measures expressly state that they are "general guidelines only," and "not a strict set of rules to be followed in every circumstance." Likewise, the evidence fails to show that Oracle's termination procedures prohibit a manager from effecting a termination in less than fourteen days. The internal "policy" on which Spandow relies is an instruction to Oracle's managers regarding the timely submission of paperwork.[8]

Second, Spandow asserts Oracle failed to apply the same standards applied to him to other employees because Oracle did not terminate Trudeau, even though Trudeau was known to "rant and rave." Regarding Oracle's treatment of Trudeau, the evidence fails to show that Spandow and Trudeau's respective conduct was comparable. See Moran v. Selig, 447 F.3d 748, 755 (9th Cir. 2006) (comparators must be "similarly situated . . . in all material respects"); Vasquez v. Cnty. of Los Angeles, 349 F.3d 634, 641 (9th Cir. 2003)

---

[8] The Involuntary Termination Recommendation Form Benelli used includes written instructions for the manager. In pertinent part, the form states: "To recommend the INVOLUNTARY termination . . . of an employee, this form must be completed and returned to your Human Resources Manager prior to any discussions with the employee. Submit the completed form **at least fourteen days** prior to the day you recommend as the employee's last day of work. [¶] It is only after pre approval by your HR Manager that the involuntary termination process may proceed." Notably, another version of this same form, submitted into evidence by Spandow, instructs the manager to: "Submit the completed form at least 5 days prior to the day you recommend as the employee's last day of work."

1  (employees are not similarly situated if they "d[o] not engage in problematic conduct of
2  comparable seriousness").  Although Benelli and other managers exchanged emails
3  regarding Trudeau's tendency to yell at employees, there is no evidence Trudeau engaged
4  in the type of insubordinate and inappropriate conduct Spandow allegedly engaged in.
5       Third, Spandow asserts that termination based on the two emails he sent to Downer
6  is "spurious" because he and Downer had "a close relationship."  Regardless of whether
7  Spandow and Downer had such a relationship at any point during Spandow's employment,
8  the evidence clearly demonstrates that Downer found Spandow's behavior "inappropriate
9  and unprofessional," that she requested Spandow be excluded from training activities, and
10 that she told Benelli she would have "zero tolerance" for any further inappropriate conduct.
11 The evidence also demonstrates that Benelli and Trudeau warned Spandow to correct such
12 behavior prior to the incident leading to his termination.  Given this history, termination
13 based in part on the emails to Downer does not appear "spurious."  Moreover, the record
14 reflects that Oracle did not terminate Spandow based solely on the emails to Downer, but
15 also for his general demeanor, refusal to do his job, insubordination, and lack of contrition.
16      Finally, Spandow asserts that Oracle did not keep attendance records as to which
17 managers participated in the role-play trainings.  In so asserting, Spandow appears to
18 suggest that participation in the trainings was unimportant, and thus, his failure to
19 participate did not constitute a legitimate reason for termination.  As an initial matter,
20 Oracle's failure to keep attendance records does not itself demonstrate that participation in
21 the trainings was unimportant.  Moreover, Oracle did not terminate Spandow simply for
22 failing to participate in a single training; rather, Oracle terminated Spandow for his
23 categorical refusal to perform a mandatory duty, for his inappropriate and unprofessional
24 emails, and for his derogatory remarks regarding fellow employees.
25      In view of the forgoing, Spandow has failed to produce sufficient evidence showing
26 that Oracle's proffered explanation for his termination is unworthy of credence.  Oracle's
27 motion for summary judgment on Spandow's retaliation claim therefore is GRANTED.
28

### C.   NATIONAL ORIGIN DISCRIMINATION CLAIM

Spandow alleges that Oracle treated him less favorably because he was an Irish national and that Oracle replaced him with an employee outside of this protected class.  In opposition to Oracle's motion, Spandow claims Oracle offered him a lower base salary than that paid to his Regional Manager "peers."  According to Spandow, Oracle paid two other employees with the same job title and responsibilities a higher salary, even though Spandow was more experienced and better qualified for the role.  Spandow cites no evidence to support the claim that he was more experienced and better qualified.  Spandow further asserts, without evidentiary support, that neither of the identified employees is from Ireland.  Finally, without further elaboration, Spandow claims he was "repeatedly denied promotions, and ultimately terminated due to his national origin."

Title VII provides that employers may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1). "A plaintiff alleging disparate treatment under Title VII must first establish a prima facie case of discrimination by offering evidence that 'give[s] rise to an inference of unlawful discrimination.'"  EEOC v. Boeing Co., 577 F.3d 1044, 1049 (9th Cir. 2009) (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).  Where, as here, a plaintiff relies on circumstantial evidence, he must show that: (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly-situated individuals outside the protected class were treated more favorably.  Surrell, 518 F.3d at 1105 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802(1973)).  If a plaintiff makes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action.  Boeing Co., 577 F.3d at 1049.  "If the employer does so, the plaintiff must then show that the articulated reason is pretextual 'either directly by persuading the [fact-finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"  Id. (citing Burdine, 450 U.S. at 256).

The Court finds summary judgment appropriate.  As a threshold matter, because Spandow's complaint is devoid of any allegation supporting a claim of discrimination with respect to compensation, such a claim is not properly before the Court.  See <u>Pickern v. Pier 1 Imports (U.S.), Inc.</u>, 457 F.3d 963, 968-69 (9th Cir. 2006); <u>Masden v. Risenhoover</u>, 2013 WL 1345189, at *18 (N.D. Cal. 2013).  Moreover, regarding Spandow's claim of national origin discrimination, the Court finds Spandow has failed to offer any evidence that gives rise to an inference of unlawful discrimination.  Spandow has offered no evidence, direct or circumstantial, even suggesting that his national origin was the "motivating factor" for any adverse employment action.  Finally, with regard to Spandow's termination, Oracle has articulated a legitimate, non-discriminatory reason for that action.  Spandow, in turn, has not raised a triable issue of fact regarding pretext.  There is no evidence suggesting Spandow's termination was motivated by animus against Irish nationals.  Nor is there sufficient evidence showing that Oracle's proffered explanation for Spandow's termination is unworthy of credence.  Accordingly, Oracle's motion for summary judgment on Spandow's national origin discrimination claim is GRANTED.

## IV. **CONCLUSION**

For the reasons stated above, IT IS HEREBY ORDERED THAT:

1. Spandow's Motion for Administrative Relief to File Under Seal is GRANTED.

2. Spandow's Objection to Evidence Re: Declarations In Support of Defendant's Motion for Summary Judgment is OVERRULED.

3. Oracle's Motion for Summary Judgment is GRANTED.

4. The Clerk shall close the file and terminate any pending matters.

IT IS SO ORDERED.

Dated:  8/18/15

SAUNDRA BROWN ARMSTRONG
United States District Judge